No. 75,781

STATE OF KANSAS, *Appellee*, v. MICHAEL J. MITCHELL, *Appellant*.

(942 P.2d 1)

Opinion filed July 11, 1997.

*Thomas W. Bartee*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Alan J. Stecklein*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: The primary issue in this felony-murder case arises from defendant Michael J. Mitchell's claim that the district court erred in failing to instruct the jury on self-defense. Mitchell also claims error for the failure to give PIK Crim. 3d 68.07 (jury must decide

each of two charges separately). Neither instruction was requested at trial.

Mitchell, a cocaine seller with a handgun, was convicted under K.S.A. 21-3401 for the felony murder of Donald Beebe, a cocaine buyer with a handgun. Beebe's death resulted from a sale "gone wrong." Mitchell was also convicted of felony possession of cocaine (2 weeks after the homicide), under K.S.A. 1996 Supp. 65-4160. Our jurisdiction is under K.S.A. 22-3601(b)(1) (a sentence of life imprisonment).

We affirm, finding no error on the self-defense instruction issue and no reversible error on the failure to give PIK Crim. 3d 68.07.

## FACTS

Barbara Williams and Nathaniel Pete Hill had been "doing" crack obtained from Mitchell. Early in the morning of December 15, 1994, they met a truck driver (Beebe) who said he was looking for an "eight-ball" of crack (approximately ⅛ ounce of rock cocaine) and asked if they knew where to get any. Hill thought Beebe was acting strange, like "in a rush to get high." Beebe told them that he would give them some crack if they would help him get it. Williams and Hill each contacted Mitchell.

Mitchell arrived with Hill and parked in front of the truck. Hill got in the cab with Beebe and Williams. Mitchell stood on the passenger side of the cab with the door open. Beebe told Mitchell to shut the door. Mitchell climbed into the passenger seat. Mitchell showed a baggie containing cocaine and gave a "20" to Beebe, who smoked it in a glass pipe. Mitchell wanted his money. Beebe said he wanted to talk to Mitchell alone to do some business and asked Williams and Hill to leave, which they did. Beebe and Mitchell moved back to the cab's sleeper area and pulled the curtain. Williams and Hill sat on the curb in front of Mitchell's car. Williams heard the first loud shot and looked up to see the curtain in the truck blowing up, as if over an open window. She heard three or four loud shots, with a second or two pause between the first and second shots and the later shots being closer together. She saw Mitchell get out of the truck looking angry, walk to his car, and drive off slowly and calmly. Neither she nor Hill returned to the

truck. They went to Mitchell's house, because Hill wanted to see if Mitchell was hurt. Mitchell's right leg was bleeding. Williams saw a .357 revolver that Mitchell threw on the bed. She did not see any other weapons. Mitchell said he did not know Beebe had a gun and that Beebe shot him with a .25 caliber pistol. He said he needed to go to the hospital and left.

At trial, Hill described hearing the gunshots. First, he heard a "small sound" and then three big sounds "all together." Hill also saw the .357 revolver on the bed at Mitchell's house afterwards. Mitchell showed Hill a .25 caliber pistol. Hill had previously seen Mitchell with the .357 revolver, a Smith and Wesson, but had never seen him with a .25 caliber pistol before.

A surgeon testified that on December 15, 1994, Mitchell was treated in the emergency room for a gunshot wound in the right thigh. Mitchell told the surgeon that he had been robbed and shot at a street corner.

The homicide investigation began on the evening after the shooting, when the police opened the passenger door of the truck and found Beebe's body in the sleeper area of the cab. The autopsy revealed three gunshot wounds: one in the left side of the back, and two in the back of the head. Soot deposits on Beebe's jacket at the gunshot wound locations revealed that the two gunshots to the back of the head were at close range. Powder deposits showed that the wound to the back was also from a gunshot at close range.

Police searched the truck and found a partial box of .25 caliber bullets (five were missing) in the overhead compartment. The sleeper area showed evidence of a struggle. Beebe's widow testified that Beebe told her he had purchased a .25 caliber pistol in November 1994 and carried it to protect himself.

The investigation shifted to Mitchell's house. A residential narcotics search warrant was executed on December 30, 1994. Mitchell answered the door, attempted to escape, and was apprehended in the basement. He had crack cocaine in a plastic bag and $490 in cash in his pockets.

Police questioned Mitchell about the Beebe homicide. Mitchell initially denied involvement, but then admitted struggling with Beebe inside the cab and being wounded. Mitchell said that Hill

and Williams had come to his house and told him a truck driver wanted to buy $150 worth of crack cocaine. Mitchell went to the truck driver to talk about the cocaine. Mitchell claimed the truck driver shot him with a .25 caliber pistol before Hill fired a .357 revolver. The police interviewed Hill and Williams separately. They described Mitchell's involvement in the shooting. Hill denied firing any weapon.

Mitchell later appeared at police headquarters with his attorney to give another statement. Mitchell said that Hill came to his house and told him a truck driver (Beebe) had marijuana for sale. Mitchell was interested, had $500 for the purchase, and went to see Beebe. Beebe pulled a .357 revolver and tried to rob Mitchell. Mitchell struggled with Beebe in the sleeper area. Williams and Hill stood outside. Mitchell claimed the revolver went off during the struggle. Mitchell would not admit taking the gun away from Beebe. The detective who took Mitchell's statement was skeptical of Mitchell's story and could not see how Beebe was shot in the back of the head while still struggling over the gun.

Mitchell did not testify at trial or present any witnesses. The two statements he gave to police were admitted into evidence.

Mitchell's motion for a new trial asserted for the first time that a self-defense instruction should have been given. The district judge, in denying the motion, responded: "[T]hat is not a defense, as I understand it, in a felony murder case, so that being the case, I think all of these grounds alleged by the defendant are without merit."

## DISCUSSION

### The Self-Defense Instruction

The primary issue is whether the district court erred in failing to instruct on self-defense. Mitchell acknowledges that because the instruction was not requested, the "clearly erroneous" standard of review applies. See K.S.A. 22-3414(3); *State v. DePriest*, 258 Kan. 596, Syl. ¶ 4, 907 P.2d 868 (1995).

K.S.A. 21-3214(1) provides that the defense of self-defense under K.S.A. 21-3211 is not available to a person who "[i]s attempting to commit, committing, or escaping from the commission of a *forc-*

*ible felony.*" (Emphasis added.) We recently applied this statute in *State v. Shortey*, 256 Kan. 166, 173-74, 884 P.2d 426 (1994) (commission of a forcible felony precludes the giving of a self-defense instruction). After robbing a gas station, Shortey was apprehended in his car by police. A struggle followed between the two officers and Shortey. Before being subdued, Shortey pulled one of the officer's guns from the holster and pointed it at the officer. Although no self-defense instruction was requested at trial, on appeal, Shortey unsuccessfully argued that he should have been allowed to assert self-defense as to the aggravated assault on a law enforcement officer charge.

K.S.A. 21-3110(8) provides:

" 'Forcible felony' includes any treason, murder, voluntary manslaughter, rape, robbery, burglary, arson, kidnapping, aggravated battery, aggravated sodomy and any other felony which involves the use or threat of physical force or violence against any person."

First-degree felony murder means the killing of a human being committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." K.S.A. 21-3401(b). K.S.A. 21-3436 (a)(14) defines as an inherently dangerous felony "any felony offense as provided in . . . K.S.A. 1995 Supp. 65-4160 through 65-4164 and amendments thereto." Mitchell's felony-murder charge alleged sale of cocaine as the inherently dangerous felony. Mitchell acknowledges that sale of cocaine is an inherently dangerous felony under K.S.A. 21-3436(a)(14), and is therefore a sufficient underlying crime for felony murder. He argues, however, that sale of cocaine is not a K.S.A. 21-3110(8) forcible felony; therefore, self-defense should be available to him. According to Mitchell, the sale of cocaine is a consensual crime, so it cannot be "forcible." We disagree.

We examine the interplay of the theory of self-defense and the statutory definitions of "forcible" and "inherently dangerous" felonies. Our analysis of Mitchell's primary contention commences with the statutory authorization for self-defense. K.S.A. 21-3211 provides: "A person is justified in the use of force against an ag-

gressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force."

The recent history of the felony-murder statute merits discussion. We described the 1969 and 1972 statutory changes in *State v. Hoang*, 243 Kan. 40, 43, 755 P.2d 7 (1988):

"In 1969, the Kansas Legislature adopted the new criminal code, replacing K.S.A. 21-401 (Corrick) with K.S.A. 21-3401. L.1969, ch. 180, § 21-3401. In so doing, the revised statute eliminated the enumeration of felonies which specifically gave rise to the application of the felony-murder doctrine. In 1972, K.S.A. 21-3401 was amended to its present form which provides that murder in the first degree is 'the killing of a human being . . . in the perpetration or attempt to perpetrate any felony.' L. 1972, ch. 112, § 1."

We expressed the following concern with the 1972 version of the felony-murder statute in *State v. Lashley*, 233 Kan. 620, 631, 664 P.2d 1358 (1983):

"A literal reading of this statute would find any felony to be sufficient to support a charge of felony murder if a causal relation exists. The purpose of the statute is to deter those engaged in felonies from killing negligently or accidentally, and that doctrine should not be extended beyond its rational function which it was designed to serve."

Before the 1992 amendment to K.S.A. 21-3401 (murder in the first degree) and the enactment of K.S.A. 21-3436 (inherently dangerous felony), courts looked to the K.S.A. 21-3110(8) definition of forcible felony in determining whether the underlying felony in a felony-murder case was inherently dangerous. See, *e.g., State v. Lucas*, 243 Kan. 462, 466, 759 P.2d 90 (1988), *aff'd on reh.* 244 Kan. 193, 767 P.2d 1308 (1989), ("Clearly, all of the crimes specifically designated [in K.S.A. 21-3110(8)] would supply the requisite underlying felony for a felony-murder conviction unless the doctrine of merger applies."); and *State v. Strauch*, 239 Kan. 203, 216, 718 P.2d 613 (1986), where aggravated criminal sodomy was held to be an inherently dangerous felony to support a felony-murder charge ("The underlying felony in the felony-murder rule must be a forcible felony, one inherently dangerous to human life."). If the underlying felony fit within those listed in K.S.A. 21-3110(8), the determination was straightforward. However, if

none of the crimes listed in K.S.A. 21-3110(8) applied and the catchall portion of the definition ("any other felony which involves the use or threat of physical force or violence against any person") had to be applied, the determination became more problematic.

In *State v. Wesson*, 247 Kan. 639, 802 P.2d 574 (1990), *cert. denied* 501 U.S. 1236 (1991), we considered whether an attempted crack cocaine sale could serve as the underlying felony to support a charge of felony murder under K.S.A. 1989 Supp. 21-3401 (which contained the "killing of a human being . . . in the perpetration of or attempt to perpetrate any felony" language). Wesson was convicted of felony murder and attempted sale of crack cocaine. The victim, who had been stabbed many times in the chest, was found in an automobile with the engine running, slumped against the steering wheel. Traces of cocaine and a pipe were found. Witnesses had observed Wesson leaning in the victim's car window with a knife in his hand. Wesson admitted trying to sell crack cocaine to the victim. We reversed the felony-murder conviction and remanded, reasoning that there is nothing inherently violent or forcible in the sale of crack cocaine. We also concluded that a sale of crack cocaine, when viewed in the abstract, is not inherently dangerous. 247 Kan. at 645-47.

In 1990, the legislature amended K.S.A. 21-3401, expanding the felony-murder definition to specifically include killing of a human being committed "in the perpetration of, attempt to perpetrate, or as a result of the commission of any felony offense as provided in K.S.A. 65-4127a or 65-4127b [the predecessor statutes to K.S.A. 1996 Supp. 65-4160 through 65-4164], and amendments thereto." L. 1990, ch. 100, § 2. The 1990 amendment to the felony-murder statute legislatively overruled *Wesson*.

In 1992, the legislature accepted *Wesson's* invitation to adopt a more specific first-degree felony murder statute (247 Kan. at 646). K.S.A. 21-3401 was totally revised to define felony murder as the killing of a human being committed "in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in [K.S.A. 1993 Supp. 21-3436] and amendments thereto." L. 1992, ch. 298, § 3. As part of that same law, K.S.A. 1993 Supp. 21-3436, statutorily defining specific crimes as inherently dangerous felonies

(including at subparagraph [17] "any felony offense as provided in K.S.A. 65-4127a, 65-4127b or 65-4159"), was enacted. L. 1992, ch. 298, § 77. With the 1992 amendment, the legislature came full circle. Once again, the legislature has specifically enumerated the felonies giving rise to the felony-murder doctrine, rather than leaving to the courts the task of sorting out what crimes should be considered as inherently dangerous felonies in felony-murder cases. See *State v. Gayden*, 259 Kan. 69, 76, 910 P.2d 826 (1996), for further discussion of the 1992 legislative changes.

The statutory definition of forcible felony, first contained in L. 1969, ch. 180, § 21-3110, has remained unchanged. The crimes listed as forcible felonies in K.S.A. 21-3110(8) do not overlap completely with those listed as inherently dangerous felonies in K.S.A. 21-3436. Child abuse (K.S.A. 21-3436[7]), felony theft under subsection (a) or (c) of K.S.A. 21-3701 (K.S.A. 21-3436[8]), drug-related felonies (K.S.A. 21-3436[14]), and criminal discharge of a firearm in violation of K.S.A. 21-4219 (K.S.A. 21-3436[15]) are crimes listed as inherently dangerous felonies but not expressly listed as forcible felonies under K.S.A. 21-3110(8).

Our past consideration of crimes not listed in both categories helps in resolving the present issue. In *Lucas*, 243 Kan. at 466, in comparing the crime of abuse of a child (as defined by K.S.A. 1987 Supp. 21-3609) to the statutory definition of forcible felony in K.S.A. 21-3110(8), we said: "Clearly, abuse of a child . . . is a felony inherently dangerous to human life." In *Lashley*, 233 Kan. at 633, we decided that felony theft under subsections (a) or (c) of K.S.A. 21-3701 qualified as a forcible felony under the catchall definition in K.S.A. 21-3110(8) and was therefore inherently dangerous. K.S.A. 21-3436(8) is a codification of *Lashley*.

Sale of cocaine is the only felony now included in K.S.A. 21-3436 as an inherently dangerous felony that we previously have held was not a forcible felony (although in the pre-1992 amendment context of determining whether it was an inherently dangerous felony). All of the other felonies listed in K.S.A. 21-3436 would also qualify as forcible felonies.

The State asserts that there should be no distinction between inherently dangerous felonies and forcible felonies. Case law be-

fore the 1992 enactment of K.S.A. 21-3436 supports that argument. However, lack of total overlap (although almost total) between statutorily defined inherently dangerous felonies and forcible felonies leaves open the question raised by Mitchell: Did K.S.A. 21-3436 create a distinction, at least concerning the drug transaction crimes included in subparagraph (14)?

The State argues that drug transaction crimes should not be the exclusive exception to the rule that self-defense is not available in felony-murder cases, because, otherwise, the purpose of making drug transactions a supporting crime for felony murder would be undermined. The 1990 amendment to K.S.A. 21-3401 and the 1992 enactment of K.S.A. 21-3436(14) show that the legislature emphatically intended to extend the felony-murder doctrine to killings occurring during drug transactions. Officer Hernandez (who participated in Mitchell's apprehension and arrest) testified that it was "very common" for someone involved in narcotics activity to carry a weapon. A shooting during a drug transaction would not be unexpected.

The legislative overhaul of the felony-murder statute in 1992 requires us to re-examine the reasoning applied in *Wesson* and the "abstract approach" announced in *State v. Underwood*, 228 Kan. 294, 306, 615 P.2d 153 (1980). If the felony sale of cocaine is viewed in the abstract, as it was in *Wesson*, then it does not fit within the catchall definition of a forcible felony. The elements of that crime do not involve any threat or use of physical force or violence against any person, although threat, force, or violence may frequently be involved in cocaine sales on the street. Courts no longer have the task of determining whether a crime is inherently dangerous. K.S.A. 21-3436 addressed our concern, expressed in *Lashley*, 233 Kan. at 631, that overextension of the felony-murder doctrine had to be guarded against. Either the crime fits within one of the K.S.A. 21-3436 categories or it does not. Comparison of the crime to those listed in K.S.A. 21-3110(8) (definition of forcible felony), or to the catchall portion of the definition, is no longer required. In determining whether sale of cocaine is a forcible felony, we find consideration of the circumstances of the commission of the crime, in addition to the elements of the crime in the ab-

stract, appropriate because the legislature has determined a cocaine sale to be inherently dangerous.

Here, we conclude the circumstances of the cocaine sale showed the threat or use of physical force or violence against a person. Both the buyer and the seller carried and used concealed firearms. The result was Beebe's death.

Mitchell argues that two recent cases, *State v. Alderson*, 260 Kan. 445, 922 P.2d 435 (1996), and *Gayden*, 259 Kan. 69, in which we addressed the claims of self-defense in felony-murder cases, show that self-defense may be available in certain felony-murder situations. *Alderson* and *Gayden* are distinguishable because in both cases, self-defense was asserted as justification for committing the underlying felony. Here, Mitchell is not claiming any justification for committing the underlying felony of selling cocaine.

The State contends that even if self-defense were available to Mitchell, the evidence was not sufficient to warrant a self-defense instruction. According to the State, the fact Beebe was shot in the back and back of the head does not show imminent danger to Mitchell at the time of the shooting. We need not address the State's alternative argument because we hold the district court did not err in refusing to instruct on self-defense.

The significant changes to the felony-murder statute after *Wesson*, with the legislature having expressly defined sale of cocaine as an inherently dangerous felony, justify reconsideration of our reasoning in *Wesson*. The abstract approach, first taken in *Underwood*, is not controlling in the determination of whether a felony is forcible because the legislature has now statutorily defined inherently dangerous felonies.

### The Separate Charges Instruction

Mitchell claims that the trial court erred in failing to give PIK Crim. 3d 68.07, which states:

"Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to

each crime charged must be stated in a verdict form signed by the Presiding Juror."

The "clearly erroneous" standard of review applies.

Although PIK 3d Crim. 68.07 was not given, the jury received separate verdict forms, one for each count. The jury also was given a separate instruction for each count, stating the elements needed to establish each charge. The instruction for the first-degree murder charge referred to events resulting in Beebe's death on December 15, 1994. The instruction on the possession of cocaine charge referred to Mitchell's possession of cocaine on December 30, 1994.

Although PIK Crim. 3d 68.07 should have been given, we find no prejudicial error. The two counts concerned different crimes occurring at different locations on different dates. Separate instructions and verdict forms were given for each. Under such circumstances, we conclude that the jury was not misled into believing that a finding of guilty on one count dictated a like finding on the other. See *State v. Cameron & Bentley*, 216 Kan. 644, 651, 533 P.2d 1255 (1975).

The failure to give PIK Crim. 3d 68.07, although error, was not clearly erroneous.

Affirmed.